**IN THE COURT OF APPEALS OF IOWA**

No. 24-2051
Filed September 17, 2025

IN RE THE MARRIAGE OF ANGELA JOY TOOP
AND BRIAN SCOTT TOOP

Upon the Petition of
ANGELA JOY TOOP n/k/a ANGELA JOY ZIEGLER,
        Petitioner-Appellee,

And Concerning
BRIAN SCOTT TOOP,
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Linn County, David M. Cox, Judge.


        A parent appeals a physical-care modification order.  **AFFIRMED.**


        Dana A. Judas of Nazette Marner Nathanson Knoll LLP, Cedar Rapids, for
appellant.

        Caitlin Slessor of Shuttleworth & Ingersoll, PLC, Cedar Rapids, for appellee.


        Considered without oral argument by Schumacher, P.J., and Buller and
Sandy, JJ.

**BULLER, Judge.**

Brian Scott Toop (who goes by Scott) appeals the district court's modified dissolution decree placing physical care of his children with their mother, Angela Toop (now Ziegler). Considering the history of these parents, the record before us, and the district court's credibility findings, we affirm.

## I.    Background Facts and Proceedings

In 2019, Scott and Angela dissolved their eight-year marriage. The court ordered joint legal custody and shared physical care of the couple's minor children, born in 2014 and 2017. Angela appealed the question of shared physical care, and a panel of this court affirmed. *In re Marriage of Toop*, No. 19-0543, 2020 WL 110352, at *3 (Iowa Ct. App. Jan. 9, 2020).

In November 2020, Angela petitioned to modify physical care of the children, alleging a "substantial change in circumstances [that] includes but is not limited to: non-compliance with the Decree, meeting the children's medical and other needs, and communication issues." She filed contempt actions against Scott alleging he failed to contribute to the children's expenses (including school tuition) and used unknown caregivers for the children.

The parties entered into a stipulated modification in May 2022, which continued the joint legal custody and shared physical care. Angela had the children Sunday evening through Tuesday, Scott had them Wednesday and Thursday, and they alternated weekends. Both children have significant medical needs; the younger child has traveled to Omaha at least once a month for several years for medical appointments with a specialist, and the older child has had a variety of therapies for anxiety and ADHD.

In the summer of 2022, Angela's employer offered her a transfer to Omaha with the potential for a promotion not available in Cedar Rapids, where both parents had been living. Angela accepted the transfer and relocated to Omaha in the fall. She splits her time between the two cities to exercise her scheduled care time, staying with her parents in Cedar Rapids. When she moved, Angela researched the different school districts before deciding where to buy a house.

In December 2022, after the parties were unable to come to a physical care agreement, Angela again petitioned for modification to seek physical care of the children. She noted in her petition Scott "failed to support the children's academic, medical, and extra[curric]ular obligations." Scott's answer requested he be granted physical care of the children. In August 2024, Scott amended his answer to also request sole legal custody of the children.

Generally, Angela is a planner—she does research and looks ahead to expected changes for the children, including finding appropriate specialists and possible extracurriculars for the children near her new home. She maintains a consistent schedule for the children, and at one point she created a log with the older child's teacher to make sure papers going home or to school were accounted for. Angela's parenting includes having the children video-call Scott every night as part of their bedtime routine and his picture in their bedrooms. She would send him videos of "major" events like the children learning to ride bicycles, and she helped the children with gifts for Scott for his birthday and holidays. And Angela has provided all the transportation to and from the children's weekends in Omaha. Angela testified she was in therapy and working on her communications with and

feelings about Scott. Angela's supervisor described her as someone who "tells you exactly like it is."

Scott works as a nurse, and he had plans to return to school for a more advanced nursing degree. In the fall of 2022, the children began staying at Scott's on Tuesday nights as well as Wednesday and Thursday due to Angela's commute. Around the same time, he started occasionally volunteering at the children's school. Scott transferred the younger child from a Montessori preschool to the public-school kindergarten mid school year to accommodate his work schedule. According to Scott, Angela continued to be controlling as to the children's healthcare decisions and dismissive toward him. He remarried in summer 2024, and his new wife works from home. He said his wife and the children have a "very loving" relationship and that she supports him in taking care of the children. Scott has not introduced his new wife to Angela, and he doesn't bring her to any of the children's events or conferences if Angela might attend. He signed the younger child up for a tournament and did not inform Angela of it because he wanted to bring his wife. He told the court he wanted to see Angela be more respectful in speaking to him and respect his boundaries before introducing them. Scott is less of a planner than Angela. For example, he was not certain what local middle school the older child would attend the next year or what after-school care options were available.

Following a two-day trial, the court placed physical care with Angela and denied Scott's requests. The court observed Scott's request for legal custody might be a reaction to a recent supreme court decision but was still "misguided at best and spiteful at worst." And it described some of Scott's testimony about hiding

information from Angela as "false and self-serving" to the point it "defie[d] all logic and harmed his credibility." The court further found the parties' communication issues were "not so substantial as to require the termination of the legal parental rights of one party over the other," and Scott fell "woefully short of establishing sufficient evidence" to support a change in legal custody. And the court found Angela had established the ability to provide superior care to the children than Scott, placing the children in her physical care with visitation to Scott. The court acknowledged problematic behavior by both Scott and Angela. But it noted Angela's attempts to improve and to support Scott's relationship with the children while Scott had not similarly supported Angela's relationship with the children, and it specifically found Angela more credible on the issue. Considering all the actions by both parties, the court concluded that, while both parties "are good parents," Angela demonstrated a superior ability to keep Scott informed and put in the effort to remain the physical-care parent, including two years of weekly drives and its impact on her personal and professional life.

Scott appeals.

## II. Standard of Review

"Petitions to modify the physical care provisions of a divorce decree lie in equity[, and] our review is de novo." *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015) (internal citation omitted). We give weight to the district court's factual findings, particularly regarding the credibility of witnesses, but we are not bound by them. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). "The children's best interest is the controlling consideration," providing "the

flexibility necessary to consider unique custody issues on a case-by-case basis."
*Hoffman*, 867 N.W.2d at 32 (cleaned up).

### III. Discussion

The sole issue on appeal is the court's placement of the children in Angela's physical care—Scott argues "the children's best interests are served by placing [physical] care with him." Scott does not appeal the district court's ruling on his request for sole legal custody. Both Scott and Angela seek appellate attorney fees.

### A. Physical Care

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children. A parent seeking to take custody from the other must prove an ability to minister more effectively to the children's well being. The heavy burden upon a party seeking to modify custody stems from the principle that once custody of children has been fixed it should be disturbed only for the most cogent reasons.

*In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).

Neither party disputes on appeal that there was a substantial change in circumstances. And we agree with the district court that Angela's move was a material and substantial change in circumstances supporting a modification of the joint physical care order.

As both parents sought physical care of the children, each had to prove they would be the superior parent. *Frederici*, 338 N.W.2d at 158. Our controlling consideration is which placement would be in the children's best interests. *Hoffman*, 867 N.W.2d at 32. We look at the factors from Iowa Code

section 598.41 (2022) "to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695–96 (applying section 598.41 custody factors to a physical-care decision). And because they are both good parents, many of the factors do not weigh starkly in favor of one over the other here. Like the district court, we find the factors relating to parental communication and support of the other parent's relationship tilt the scales toward Angela.

At trial, Scott's attorney asked Angela about the previous times she had sought physical care of the children—including the temporary order and original decree—and the court's past concerns about her ability to foster the children's relationship with Scott. Angela acknowledged those concerns, then shared how it motivated her to change, explaining: "I worked really hard to make sure that I was initiating those video calls, that they were uninterrupted, that I'm inviting Scott to the kids' birthday parties, that I make sure they have gifts from the kids. I work really hard for that." Under further questioning, she explained that, since the 2021 appeal of the original decree,

> I think I have demonstrated a really long history to make sure that he has ongoing contact with the kids, even during his times where he has not exercised his time, I'm making sure that he is getting those video calls and making sure that he has opportunity for private conversations with the kids. I do gifts. I make sure he has the opportunity to be involved in their birthday parties. I make sure that I have pictures of Scott up in the kids' rooms.
> I've really worked a lot on trying to make sure I have created those routines and I make sure to write my parenting plan with those perfections [sic] in . . . place so we can make sure that those are honored.

She opined that Scott was not making the same effort toward collaboration and facilitating her relationship with the children.

When Scott was asked what he could provide if he had physical care that Angela couldn't, Scott answered: "It's the stability and network that is still here. Continuity. So I think that uprooting them and moving them to another state jeopardizes all of that." He also noted the children would see Angela's parents and his own wife less if Angela had physical care. When asked what he was doing to improve the co-parenting relationship, Scott described trying to minimize contact with Angela, "bit[ing his] tongue a lot," and reaching out to "put things on her radar"; he was unable to think of any other steps to improve their coparenting relationship. His proffered support of Angela's relationship with the children was to allow her extra time "when it is reasonable," discouraging the children from calling his new wife "mom," and "allow[ing] them to make . . . phone calls" with Angela. He agreed the children were probably able to pick up on the fact that he dislikes Angela.

We agree with the district court that the parties largely seemed more interested in one-upping each other rather than working together for what's best for the children. Both parents bear some blame for that. And communication has been a problem between them since their separation. But Angela at least acknowledges and is working on her shortcomings related to Scott, and she actively supports his relationship with the children. Scott's response to these efforts has been to avoid Angela and communication with her whenever possible, to prevent her meeting the children's stepmother (despite wanting the children to live with them full-time), and attempting to assume full legal custody. As the district court observed, Scott needed to not only show he *could* be the physical-care parent, but that he could be a *better* physical-care parent than Angela, and "[h]e failed to meet that burden."

Considering the history of these parents, the record before us, and the district court's fact and credibility findings, we agree placement with Angela is the better option to foster both parents' relationships with the children and promote communication regarding the children.

## B. Appellate Attorney Fees

Scott seeks appellate attorney fees in the amount of $10,000. Angela also requests appellate attorney fees, requesting a remand for the district court to determine a reasonable amount. In a modification action, "the court may award attorney fees to the prevailing party in an amount deemed reasonable by the court." Iowa Code § 598.36. "An award of attorney fees on appeal is not a matter of right, but rests within the court's discretion and the parties' financial position." *In re Marriage of Gonzalez*, 561 N.W.2d 94, 99 (Iowa Ct. App. 1997). In making this determination, we consider the needs of the requesting party for an award of fees, the ability of the other party to pay attorney fees, and whether the requesting party had to defend the trial court's decision on appeal. *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013). Considering the merits of the appeal and the parties' respective abilities to pay, we decline to award either party appellate attorney fees.

**AFFIRMED.**